Good afternoon, your honors. My name is Joshua Bernstein, B-E-R-N-S-T-E-I-N, and I represent Joel West. Good morning, your honor. Assistant State's Attorney Zachary Slavens, S-L-A-V-I-S-N-V-I-C-T-E-R-E-N-S, and I represent the people of the state of Illinois. Okay, great. You know the deal is you each have 20 minutes. You don't have to use it all. Do you want to reserve some of your time? Yes, your honor. I'd like to reserve five minutes for rebuttal. Great. And then, as you know, the microphone, they don't amplify, they do record, so please keep your voices up so everybody can hear you. Thanks. Whenever you're ready. May it please the court, counsel, I intend to focus my argument on the first two arguments in our brief today, the state's failure to prove intent in the aggravated kidnapping counts and the trial judge's improper manufacturing of evidence for the state after the close of evidence. With respect to the aggravated kidnapping counts, it's really very simple. It boils down to whether or not Joe West had the intent to secretly confine Ms. Cruz and her son when he entered the currency exchange. And as we argued in the briefs, the issue with how this played out in the trial court is that... Didn't she really lock herself in to keep him out, to keep Cruz out? Yes, your honor. Once they were... She wanted to be safe from the defendant. Yeah, well, she knew that the... The double door. Yes, and that the automatic alarm had already triggered. So once she and her son were inside, her testimony is that she turned around and locked Mr. West out. And you're saying that that's the kidnapping charge that they've made? I believe the kidnapping charge they made is based on the fact that he committed an armed robbery of the keys and then a separate kidnapping by... But the kidnapping still has to be... They were going into some space that he's confining them in secret, right? Correct. Correct. The space happened to be double-doored, double-gated or whatever. Yes, and that thwarted him from completing the armed robbery of the currency exchange, which we maintain is what was really happening here. As I noted in the briefs, there's video of all of this, and I assume you've probably watched it. But the issue becomes whether he intended to confine them. We're arguing, and I think the evidence shows, particularly the video and Cruz's testimony, that he intended to get into the back room to get the money. We all know currency exchanges have no money in the lobby, and you can see it on the video. But more particularly, the... Was there any evidence? I mean, in your brief you say there's some cases that say that currency exchanges keep money in safes. But was there anything in the record that indicated that this currency exchange only had money in the safe? Not necessarily so, Your Honor. But really, I think if you look at Cruz's testimony in conjunction with the video, what she said, the state's witness said, was that he wanted to get, he wanted me to open the back. I wouldn't open it for him. He wanted me to get into the back to help him get to the money. And that's really what this was all about. And I think if you look at the Levy-Lombardi test, any aspirtation that occurred was not aspirtation in the context of kidnapping. He was moving them to the place where... The argument is that he had already taken the keys, and that the keys had already been robbed, and now once that robbery has been completed, any movement, the argument is any movement becomes the kidnapping. Respectfully, Your Honor, I think that argument is nonsense. He grabbed the keys to open the door to get into the back to get to the money. Yes, the elements of a robbery of the keys were complete because he took the keys by force. But the fact that the state didn't charge him with attempt on robbery of the currency exchange does not change the movie we watched, does not change what Cruz said. Had he wanted the keys for the sake of having the keys, he had the keys. He could have left. No, he needed the keys as a tool to access the money. This is an individual who cut his way through the roof of a currency exchange and waited for some unknown amount of time up in the ceiling. So you're arguing that there was no robbery of the keys? I'm arguing that notwithstanding any robbery of the keys, notwithstanding the state's decision to charge this that way to maximize the sentence they could get with a conviction, armed robbery versus attempt armed robbery, armed robbery of the keys versus attempt armed robbery of the currency exchange is still armed robbery versus attempt. So if they charge it as armed robbery, that maximizes the sentence that can be imposed. I concede that the video record here and Cruz's testimony establishes that he took the keys by force, right? But that doesn't establish the element of intent to commit kidnapping. He was still, despite the fact that he robbed the keys, he still had a mission which was to get the money in the back room. And only because Cruz had a, you know, they had apparently some sort of secret door there for situations, I guess, apparently like this, she was able to lock him out. So what happens then? He can't get into the back room. He throws the keys down and leaves. So that is, that's the essence of the difference between the state and myself on the intent element here. He throws the keys down because he never intended to rob her of the keys. Is that what we're calling it? Well, he robbed her of the keys with the intention of robbing the currency exchange. The keys were the thing he needed to get to the back room. The keys were not an end in and of themselves. And kidnapping and aggravated kidnapping require intent. Robbery just requires the taking. And he did the taking. We concede that. But he, there's nothing in this record, including the state's own evidence, that shows that he had the intent to secretly confine them in the back room. He wanted to get to the back room for the money. So, I'm sorry, do  you have any comment on that? No, I just followed up on what Justice Hyman said. He didn't even lock the door. She did. The victim. Sorry, go ahead. No, I understand, Your Honor. I understand what Justice Hyman is saying as well. So that's, for that reason, because we believe they did not establish the element of intent, we asked this court to reverse the aggravated kidnapping convictions outright for failure to meet their burden of proof. With respect to the judge's actions in this case, it's somewhat more complicated. There are a number of errors that the judge committed, but they all spring from the fact that after the close of evidence and during rebuttal argument, Judge Porter abandoned his neutral role as an arbiter, as a neutral arbiter, and from what the record shows, measured the knife in order to assist the state in proving that the knife was three inches long. I don't know even, I mean, it doesn't imply he measured it, but there isn't anything in the record to say there was a ruler or he did anything. I mean, it's only the words that were stated by the lawyers and the judge, right? And nothing says anything about a ruler. It would have been much more convenient for me had he said I have a ruler here and I'm measuring this knife and it's exactly three inches. But I think the natural and really only logical inference of his words, this knife is exactly three inches long, I think the only inference you can draw from that is that he measured it. How he measured it we don't know. And that, of course, is part of the problem here. But the fundamental problem is he measured it all together. Now, the record says he did a break. Did he leave the bench, do you know? Or was the break, you don't know? There's no indication. Maybe he went to get his ruler from his chambers. I honestly don't know. Oh, we're not sure yet. I'm not sure. You know, as a trier of fact, now the knife was in evidence. It was, Your Honor. So he could examine it as the trier of fact. I guess the analogy that comes to mind in that respect is if the jury wants to test the cocaine itself back in the jury room, there would probably be, you know, an issue with that. And the judge's words, look, if this was a six-foot broadsword, this wouldn't be an issue. If the judge said this thing's as long as my arm, obviously it's more than three inches. The problem is with respect to what the judge said, it's binary in this, as armed violence is charged in this case. It's either less than three inches or it's three inches. And that's the trigger. And when he says it is exactly three inches. Yeah, but I hear you. But let's say it was a jury. Now, a jury could ask for an exhibit to be sent back. And they could look at it. And they could look at it. And they could. Now, you couldn't cross-examine them because that's one of the things you say you couldn't do to the judge, but you couldn't cross-examine them. Evidence is closed. They take it into the jury room and they do whatever they do and they come out and they find them guilty. If the jury said, can we see the knife and a pair of calipers so that we can measure the length of the knife in the absence of any proof of the length of the knife at trial, I think that could be an issue. Now, that's a funny choice of your words because there was proof of the length of the knife in the record anyway, right? Mrs. Cruz testified that it was this big and let the record reflect that it was four inches. But she didn't testify to the length of the blade. So when you say the knife, you know what I mean? Yeah, you're right. I'm sorry. No, no, I'm good. Well, that was in the record. Now, we don't know what she meant by knife, I guess. That's true. We don't know what she meant by knife. And assuming the judge was correct, it was not four inches. Right. So what if it was two inches and the judge said, this isn't three inches? As the finder of fact, wouldn't he have not only to write the obligation to the defendant and everybody else to make a finding as to one of the elements of the crime in question? I guess, Your Honor, we could kind of go a little off the path here. But if it was an exacto knife If the judge were to conduct his own investigation and found out that it was only two inches, that would be unfair to the State if there's already testimony that the blade of the knife is three inches. That testimony stands. The judge has no right to conduct his own investigation. That's where the problem lies. And the fact that the judge is, in a sense, manufacturing evidence altogether. But there are things that, now, in the briefs you talk about expert opinion. Do you really think he needs expert opinion to, that the State needs to introduce expert opinion on the length of things we know? Is that not beyond the ordinary knowledge, or the knowledge of an ordinary person? Your Honor, I think on the scale of exactly three inches, if you use the rule wrong, if you're measuring not from the base of the blade, but from some other point. Well, you're looking at centimeters instead of inches. You're turning the rule of the law away. I didn't even think of that one, Your Honor. There's all sorts of problems with that, but the judge should not be conducting his own investigation. I agree. That's really the bottom line. For me, that's the bottom line. Why is it an investigation when you say, that sword is three feet? Is that an investigation or a fact finding? Well, I would say, with a sword that's three feet long, the obvious observation is it's longer than three inches. But when we're at this dividing line of three or less, that's really the problem here. And it is particularly the problem where this happened and how it happened, in that evidence was closed, there were closing arguments, defense counsel says the state failed to prove this offense, this element of this offense, and the judge goes on to purport to prove that element of the defense. The investigation itself is a problem, but it's the investigation on behalf of the state after the close of the evidence. Or if it were done on behalf of the defense, it would be a problem. That's true. But it isn't an investigation. I mean, I, well, whatever. No, go ahead. Well, the question is, what's an investigation? I think it's interesting what transpired. And what transpired is the prosecutor says to the judge, you have the knife. It's an evidence now. Your honor can simply take a look and assess for yourself. Now, taking a look and assess for yourself is one thing. That's just looking at something. Is it then an investigation when somebody takes a instrument to figure it out, not from their own eyes, ears, and so forth, their own senses, but from an instrument to determine that, when that's one of the elements of the crime? It's the closest analogy. I've not, I could not find any case law which comes close to what occurred in this case as far as measurements go. But the, I think it is an investigation. Well, I say it's an investigation because it's not simply, if the jury had the knife in the back room, they pulled out the blade and they could assess it. But this was more than just assessing. Correct. Because she says, take a look and assess for yourself. Just a minute break. You may continue. I'm going to give you, if I may approach with the, the blade is out. So apparently the blade was taken out in regard to that charge. And the judge says the blade of this knife is exactly three inches long. That doesn't sound like he was assessing. It sounds like he was investigating. Absolutely, Your Honor. I agree with that. And that's our whole point. It's something more than just a look. When you said about your research, the only other weapon I can think of that the size of it, it was part of the, was sawed-off shotguns. Did you see any cases? Because there are some cases on the court determining whether it's 18 inches or not. You know, Your Honor, I did not find those cases. And I realize now, of course, that 18 inches of the barrel of the shotgun is an issue. But I didn't find those cases. I appreciate that. That's pretty much the gist of this, what the judge's actions after the close of evidence. We believe that violated Mr. West's right to due process. And we're asking you to reverse the conviction on that. I just wanted to say, so I ask the question because it seems that if the judge could not determine from his own senses whether it was exactly three inches more or exactly three inches less, it takes something else. So if somebody can look at it without having something else, on your own sense, sometimes the jury can look at something. You want to see the dress or whatever. Right. They can make a determination with their senses. But if they brought the dress back to the jury room and the jury wanted to have a microscope, that would be an investigation. That's kind of the analogy I was drawing with the jury and the cocaine. It's something more than just looking at it. You could say this is more than three inches. But I couldn't say it's exactly. No, no, and I agree with you on that. But I'm just saying that there are situations that. And had it been a sword, my argument would be entirely different, Your Honors. Unless you have any further questions, I will ask you to reverse his convictions. Thank you. Thanks. Good morning, Your Honors. May it please the Court. Again, I am Assistant State's Attorney, Zachary Slabins, and I represent the people of the state of Illinois. The defendant was properly convicted at his bench trial because his conduct was all sufficiently distinct to support separate convictions, and the circuit court did not abandon its role as a neutral arbiter in this case. This court should affirm the defendant's convictions for aggravated kidnapping and armed violence for the following reasons. First, the people proved all elements, including intent, to establish that defendant transported the victims with the intent to secretly confine them. Judge Hyman's point that the defendant didn't confine them. The victim in self-defense, I'll use that term, locked the door to keep the defendant away from her and her son. Yes, as Your Honorable Judge Hyman noted, defendant was ultimately unsuccessful in completing all of the offenses he might have been trying to carry out there. Well, I'm talking about the elements of kidnapping, though. Confinement, secretly confinement is one of the elements. In this case, defendant was charged under intent to secretly confine. Okay. So that looks to transportation from one place to another. In this case, as the record demonstrated, defendant transported first XM, the minor victim, from the front lobby and forced him into the private enclosed rear area of the currency exchange. Where the money was. Where the money was, yes, Your Honor. But that's where he wanted to get the money, and he needed the keys, and he needed to get in that room, and he's got these two people there. Yes, Your Honor, and it might be fair to speculate that defendant's intention was to, to get in there and then rob the currency exchange, but regardless of what his ultimate goal was, he did still transport these two individuals with an intent to secretly confine them. That's the problem. I mean, you say with the intent. They object that there was no showing of intent. Right. They moved him a few feet. The cases cited in the briefs, people were moved many more miles or, you know, most of those cases were miles or, no case that I saw was as little movement as this, and where the people actually would close the door so that the defendant could not get to them. They wanted, he pushed them because he wanted to get to the, where the money was. He didn't just want the keys. He wasn't going in there to get the keys, right? Well, he already had the keys when they were in there. Right, and so now he needs, what's he going to do? Are we going to leave him alone and go into that room by himself? No, Your Honor, I don't anticipate he was probably trying to take a loan. However, to your point as to the distance and the cases cited there, all of those cases, yes, and those particular facts concerned a longer distance than a few feet or one room to another, but they all stand for the same proposition that it is well established in Illinois law. There is no minimum duration, no minimum distance required to establish kidnapping. Once defendant transports and manifests the intent, that is the offense manifested. So what is the intent? That's the question. Well, and what the, if I can. Go ahead. What the act says is by force or threat of imminent force, carries another from one place to another with intent to secretly confine that other person against his or her will. Well, this was the will of the victim, right? They locked themselves. So, you know, if you stop with confined, but that isn't what the act says. Well, Your Honor, I think it's important to note that what occurred there was Ms. Cruz ultimately defended herself and thwarted the effort and locked herself in, but she was being brought there to be secretly confined, and that goes to the definition of secret confinement. How do you know that? How do you get that intent? I'm trying to, it seems to me that's all speculation. I mean, what facts lead you to that? Just because he pushed him a few feet into a room that holds the money, supposedly, I don't see how that's the intent opinion. I mean, we're talking about a separate crime. That's the problem. Yes, Your Honor. And under Illinois law, secret confinement is defined as isolating an individual from meaningful contact with the public. And as Your Honors can observe in the evidence on the videos, that back room has no windows. It is recessed into the building. There's no means from which. But he didn't close the door. Could they have gotten out, by the way? Could they have gotten out? I don't know the mechanics of it. Could she have gotten out any time she wanted? In other words, was that even possible? So she wasn't really even confined. Do you know? To clarify, are you asking whether or not there might have been another means for escape when she was back there? It's going out the same door. But in other words, was the door, is there a way that you can get out from the inside, even though you can't get in from the outside? Because wouldn't that go to confinement, too? If you have free access to leave, are you confined? Well, in this case, the reason that she wasn't, for example, tied up or something back there was because she fought him off. And defendants should not reap a benefit because he was ultimately thwarted in his efforts. He brought them from a public area. He isolated them intentionally at knife point in the recessed private area of the currency exchange. But there's no windows, no other doors, no opportunity for her to communicate her plight or communicate with the public. You say reap a benefit, but the law is clear that if the crime is not complete, you don't get to the kidnapping. So you refer to it as reaping a benefit. Maybe he was just overcharged. Your Honor, the crime of kidnapping here is complete under the charging instrument once he transports with the intent. So he moved them from the public area to the private area. Why would he do that? Likely because he was trying to rob the currency exchange and also likely because if he had let them go, they would have thwarted his efforts. But that, again, goes to circumstantial evidence establishing his intent. It might be reasonable to assume he was trying to rob the place and he didn't want to be caught. But then that just circles back to he brought them back there because he did not want them alerting the police, perhaps. All of this is circumstantial evidence that the fact finder considered and found that intent was proven beyond a reasonable doubt. With respect to the Smith test, the crux of this inquiry is whether or not there is one crime or a sequence of crimes. And ultimately here we have a sequence of crimes. There is first a robbery of her person, which defendant does not dispute occurred. There was then the aspertation and the detention with the intent to secretly confine them. And that would likely have been followed by a robbery. But the crux of the inquiry is whether or not there are sufficiently independent acts. Defendant's brief relies extensively on whether or not she might have been used to access some money in there. But as Judge Hyman correctly noted, there's no evidence in the record that such participation was necessary. And that certainly doesn't speak to the kidnapping of the minor child here, XM. Certainly there was no use for him in the armed robbery. In the record she testifies, CC33, that defendant pushed her inside so she could get in and open the door for him. That doesn't sound like a kidnapping. That sounds like part of the attempt to rob the currency exchange. Yes, Your Honor. You do know that she did state she was pushed inside. So what? She was moved from one place to another. So kidnapping is moving a person from one place to another, period? No. No. With also the intent to secretly. Well, that's the problem. I mean, I think we come back to that. I haven't heard anything that says that he intended as part of this taking the keys to kidnap them as that is defined in the statute. Your Honor, the people contend that that is established as the circumstantial evidence. As Your Honor's concerned in the video, that area is private. There's no windows. And once she's isolated from the opportunity to communicate her plight, that is secret confinement. And the video establishes the circumstantial evidence establishing his intent to carry out that offense. Actually, it was the best thing that could happen to her, right? Because she got in there and that saved her from any further attempts by him to hurt her or the child. Yes. In this case, ultimately, her superior knowledge of the layout of the building didn't work to her advantage. But that doesn't necessarily speak to defendant's intent in trying to remove her from a public area where she could perhaps signal for help to a private area where she had no opportunity to do so. But she did. And we know she did. Well, ultimately, yes, she was able to lock him out and use the phone to call police. But regardless of what she was ultimately able to do, his intent in moving her from a public area to a private is circumstantial evidence of his intent to secretly confine her by isolating her. Well, at that point, the currency exchange wasn't open yet. So the entire building was private. Yes, Your Honor. The building was not open to the public at the time. However, as the video evidence demonstrates, the entire front lobby of the building was on a corner store with windows broadly visible to the public, floor-to-ceiling windows. So in that sense, she had the opportunity to gesture, to wave, to establish some sort of public contact. And it's that essence of public contact that is the crux of the secret confinement inquiry. So the law in Illinois is if you put somebody in a room where there's a lot of windows, then you have a good defense that they're being charged. That's what you're arguing? It is one factor to perhaps be considered. I don't know if it's referenced in the brief, but I know there's at least one Illinois case that referenced the fact that because something occurred in the lobby, it was not secret confinement. Because she was visible, she could communicate her plight. But again, in this case, the evidence is much more clear from the video that the front area was public, the rear area is private, and the defendant was forcing them into this private hidden area. And that is circumstantial evidence of intent. And the fact finder considered this evidence and found that element proven beyond a reasonable doubt. And a reasonable fact finder could certainly do so again. Turning next to the issue of the knife in evidence here. It's important to remember the procedural setting that we're at here in that defendant did not object to this at trial. And because of that, we don't have the sort of clear record that would demonstrate what occurred. A lot of the questions presented by the court earlier go to we assume, we infer, we don't know what happened. And the reason we don't know what happened is because defendant failed to object and properly preserve this issue. Well, we do. We do know what happened. Let me ask you a hypothetical. Narcotics case. So the weight of the seized substance is important. It's an element of the crime, right? Yes, Your Honor. Okay. So the State has to prove the amount of the illegal substance. Correct. So you would agree that the standard that the State must prove beyond reasonable doubt, the weight of the substance? Correct, Your Honor. So my hypothetical. In my hypothetical, the State does not prove during the trial the weight of the substance. And this is brought up in closing arguments that the defense counsel says, you know, the State did not say what the weight of the powder was. And the judge says, well, hang on. It comes back with a scale. It's exactly three grams. Is that permissible? Your Honor, in that case, likely not. So what's the difference between that case and this case? Well, Your Honor, that goes to the argument in defense's brief that this, you know, was expert testimony that occurred. And in your hypothetical, the use of a scale, a measuring device of that nature where it has to be, you know, properly weighted, tared, made sure that it's properly offset. Well, but here, we don't know if it was properly offset. We don't know were there centimeters. I mean, we don't know what measurement, but the judge does say exactly. The blade is exactly. And I think that no one can say exactly on a small pocket knife. Something's exactly. Maybe it could have been a quarter of an inch smaller. We don't know. But the judge is making that determination. It would be incredible if a human being such as a judge would be able to, through his eyes, be able to measure something to an exact amount. You would agree to that? Yeah. Two points in response, Your Honor. First, the difference between, you know, a physical dimension and a weight or a chemical property or something like that is that some of this is the subject of expert testimony and the other is not. We're just talking about weight. My hypothetical is if they proved it was illegal substance, the only thing they forgot to do was the weight. And there it is. The judge brings out a scale, puts it on a scale. Yep. It's exactly whatever. Well, yes, Your Honor. And that would be the subject of expert testimony because that relies on particularized scientific knowledge, expertise, training beyond. To weigh something? Yes, Your Honor. And the use of the particular specialized electronic equipment in doing so is beyond. So the judge has a specialized electronic equipment. I mean, you're trying to differentiate by saying it's a matter of what the device is. I'm saying it doesn't matter what the device is. A judge uses a device. Well, Your Honor. And the problem to me is what has to be proven at trial. If this is an element of a crime, which it is, our rules provide that the State has the burden of proving each of the elements. It's a procedural. It's part of what our laws are comprised of. And should we allow, then, the State not to do that and that after the case is closed, which is what happened here, a jury or a judge can then do something that takes more than one's eyes or ears? How is that fair? How is that due process? How does that comport with a fair trial? Well, Your Honor, this circles back again to the first issue I was going to bring up in that on this standard review at a bench trial, the judge is considered to only have considered the proper evidence. And there was evidence in the knife's blade length. Right. He knows it's four inches, right? It's four inches. So he's now saying, no, it's not four inches, it's three inches. So in the trial, it's four inches. Now, don't forget, in the trial, the prosecutor said it was four inches. The prosecutor could have said it was three inches and we wouldn't be here on this issue. Probably would. Perhaps, Your Honor. Because she didn't say how many inches. He said that she was using her hands. She never said, I didn't see in the transcript, she didn't say four inches. The prosecutor said she is showing four inches. Am I right? It was something to the effect of let the record reflect. She's demonstrating a four inches. Four inches. She did not say four inches. He said four inches. So that's the evidence that was in the trial. Yes. Now we've got different evidence after the trial. Is that fair to bring in different evidence after the trial? Well, Your Honor, this circles back to, first, with respect to her testimony. Again, this being a bench trial and the deference afforded to the judge as a fact finder, the trial judge was the one that observed that and was best positioned to determine what was said, what was meant, what was intended. And with respect to displaying the knife, which was properly admitted evidence and is a physical object, is evidence of itself, the inferences the judge may draw from that evidence are properly within the judge's fact-finding role. And as counsel can see here. But he's not making an inference on this. He wasn't inferring anything. He said it was exactly three inches. When we have testimony that it's four inches, that she showed four inches. Yes, the record does indicate he made that statement. But what the record does not indicate is that the judge did anything explicitly improper. And that is the burden ultimately determining whether or not an error occurred, is whether or not there was affirmative evidence in the record demonstrating that improper evidence was considered. And the reason we don't have that circles back to there was no objection. There is nothing in this record from which we can infer a measurement occurred at all. All we know is the knife was displayed by the prosecutor and the judge made a statement. And that is not enough. We know more than that. We know the blade was displayed by the prosecutor. So that's different. And the judge said the blade of this knife is exactly three inches long. Yes. And that is all that the record affirmatively demonstrates. And to establish that an error occurred here requires more than just speculating from the silence of the record. And that is because that circles back to the plain error standard in that we want records coming up that are developed so that the court can assess and we're not having to second guess what occurred from silence. And furthermore, even to the extent that any measurement might have occurred and we don't concede one did, it's well-developed in Illinois law that judges may sua sponte develop the record within their prerogative because their goal is to ensure that justice is done. And they are allowed to do so so long as they remain fair and impartial. So the knife is just a knife. It's a blade. And it is a certain length, and that is either more or less than three inches. So why can't the judge take the bag of controlled substance and measure it? Bring me in the most technical machine and he can measure it or she can measure it. What's the difference? Well, Your Honor, that goes to the fact that the use of these technical machines, these sophisticated machines. I'll tell you my hypotheticals. It's not a technical machine. Okay? I mean, again, you're trying to debate on the machine. It's not the issue. It's not the machine. The issue is what, when a judge says exactly three inches, there's been a break, and the prosecutor opens up the knife, gives it to the judge, and it's exactly three inches, when the testimony is four inches. Now, how do you, how do we, what are we supposed to do here? The judge can overrule the testimony. The trial's over. Yes. The judge can do anything they want then? Your Honor, the judges in a bench trial are afforded a wide degree of latitude as a fact finder, and they are allowed to consider the evidence and draw the reasonable inferences they see fit from that evidence. And the distinction between these technical machines and something, you know, not conceding one was used but perhaps a ruler, that goes back to the very heart of the fact-finding role, and that judges, juries, they're allowed to use their common understanding and knowledge. That's not common understanding what three inches is. We would contest that a simple measurement is. And there was no- Can a jury go, can a judge take his phone out? His phone has a ruler on it. There's a ruler on your iPhone. Can a judge take it out and compare it? Yes or no? If the judge- If the judge takes the phone out and compares it, does the judge think that the phone is a good measurement? No. The judge would say, no, that's wrong, puts the blade and puts the iPhone next to it. The State's position is that's fine. Well, that would again go to the use of the device, Your Honor. That's the device. I'm just giving you my hypothetical. Use my hypothetical. Perhaps not in that circumstance, Your Honor. What's the difference between that and using any other measuring device? Well, if they pull out a phone, there's no indication that that is something that is calibrated. And that goes back to the fact that this is not something- Calibrate it. You go back to the technicalities. I don't know if a ruler is calibrated, do we? It could be a cheap ruler. It could be a ruler that's 20 years old and it's warped. Do you know? No. No, Your Honor. We don't know here. And that circles back to the fundamental initial step, failing, in that the record does not demonstrate what, if anything, occurred beyond the knife and the blade being out, being displayed, and the judge making a statement. And to establish that an error occurred here requires more than just speculating from the silence of the record. The defendant must establish, with affirmative evidence in the record, beyond speculation, that improper evidence was considered, to find that the judge did not consider the proper evidence. And that is not satisfied here. And if there are no further questions, then we would respectfully ask that this Court affirm defendant's convictions for armed robbery- I mean, for armed violence and for aggravated kidnapping. Thank you. Thanks. Thank you. Your Honors, I don't really have anything to add to my argument. I'm convinced this Court understands exactly what I was saying. However, if you have any questions for me based on the State's argument, I'm happy to answer them. Well, the State is saying that it's permissible for the judge to eyeball and say exactly three inches. That would be okay? The State is saying that, and I think the State is categorically incorrect. And they say the burden is on you to show something otherwise because the record's silent. So they're saying you haven't made your case because you haven't shown what happened here because the record's silent. Well, actually, I believe the record isn't silent, and I believe the record speaks, and it says this blade is exactly three inches long. And I don't believe it's a reasonable inference. I don't believe you can reasonably infer that that statement is the result of anything but a measurement. And as we discussed, if you eyeball it, even if you eyeballed it and said the blade is exactly three inches long, again, he's still manufacturing evidence for the State after the close of evidence, abandoning his role as a neutral arbiter. Well, but if we took that out, all the record says is the victim saying it was this big, the State saying let the record reflect four inches and no objection. So the record says under oath it's four inches. The standard is three or more. So, and, you know. But the problem is that there was no evidence that said the blade. The victim testified that the knife was four inches. So let's just be clear on what's going on here. And then the argument in closing was that, Judge, there's been no evidence as to the blade of the knife. That's when the judge decides to take comment here. Maybe. We don't know what happened. That's correct, Your Honor. The end result being the judge saying the blade is exactly three inches long. Well, again, the issue here is during trial there was no evidence as to the length of the blade. And that's the State's verb to put that evidence in. The State did not do it. Absolutely, Your Honor. Unless Your Honors have any other questions, we, again, ask that you reverse this conviction as we argue. Thank you. Thanks. Thanks very much. We appreciate all your work, appreciate your good work, and we'll take it under your guidance. Thanks a lot. Thank you.